Filed 12/15/21  P. v. Rodriguez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>VICENTE RODRIGUEZ,<br><br>    Defendant and Appellant. | F080232<br><br>(Super. Ct. No. MCR059555)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Keith P. Sager, Carlos A. Martinez and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant was charged and convicted by jury of sexual intercourse with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (a); count 1);[1] oral copulation with a child 10 years of age or younger (§ 288.7, subd. (b); count 2); and lewd or lascivious acts against a child under the age of 14 years (§ 288, subd. (a)(1); count 3).

At the sentencing hearing, the court imposed an indeterminate term of 25 years to life for count 1 (§ 288.7, subd. (a)); a consecutive indeterminate term of 15 years to life for count 2 (§ 288.7, subd. (b)); and a determinate term of eight years for count 3 (§ 288, subd. (a)(1)). The court also imposed various fines, fees and assessments including a $108.19 booking fee pursuant to Government Code section 29550.2 and payable to the City of Madera.

Defendant argues his counsel was ineffective for failing to object to references the victim made in a forensic interview about a prior uncharged act defendant allegedly committed; the complete interview recording was admitted and played for the jury. We conclude defendant failed to establish his trial counsel's performance was deficient in this regard or that it caused him prejudice.

As for the $108.19 booking fee imposed, defendant asserts Assembly Bill No. 1869 (Stats. 2020, ch. 92, § 11, p. 14) (Assembly Bill No. 1869 or Assem. Bill No. 1869), which enacted Government Code section 6111, has rendered the unpaid portion of that fee uncollectible and unenforceable as of July 1, 2021; defendant requests this booking fee be stricken. The People maintain the booking fee became unenforceable under Government Code section 6111 by operation of law on July 1, 2021, and no further action of this court is warranted. In our view, the plain language of the statute requires that any balance of the jail booking fee that remains unpaid as of July 1, 2021, must be

---

**1**     All statutory references herein are to the Penal Code unless otherwise noted.

vacated and stricken, and we modify the judgment accordingly. With this modification, the judgment is affirmed.

## BACKGROUND

**I.      Prosecution Case**

The victim, A., was born in July 2008, and she was 11 years old during trial in August 2019. At the time of the sexual acts against her,[2] she was living with her mother, defendant—her mother's boyfriend, and her three siblings. A. shared a room with her sister, G., while A.'s brothers slept in the living room. Mother and defendant slept in the second bedroom. One night, A. was sleeping in her room with her sister. The lights were off. Defendant came into the room, but he was not supposed to be in their room because mother had told him not to go in there—it was a rule. Mother had also put a lock with a key on the girls' bedroom door. Defendant used a key to access the room. A. was underneath the blankets; defendant got underneath the blankets, and she felt him touching her in her private area, and he was also lying on top of her. Mother walked by the room on her way to the bathroom, and defendant got up because he heard the door to the bathroom close. He left A.'s bedroom. A. went back to sleep, but she heard an argument between defendant and mother the next morning—she was not sure if this was the time her mother made defendant leave the apartment.

A. remembered another time defendant came into her room at night. A. was asleep on the bottom bunk, and her sister was sleeping with her. A. awoke when someone who A. could not see carried her to the floor. She did not see who the person was because it was dark—that person had turned off the nightlight. It was a grownup who was carrying her, but it was not her mother. When she got to the floor, this person took off A.'s pajamas. A. was lying on her back, on the floor, with a rug underneath her.

---

[2]      The information alleged the offending sexual conduct occurred between July 1, 2016, and May 4, 2018.

3.

A. described how this person touched her legs and opened them and then started touching her private with that person's private part—a "boy's private part."

A. remembered telling a social worker who interviewed her that the boy's private part went inside of her private part, but A. was unable to see the grownup's face. While that was happening, A. told the interviewer that this person's face was in front of her face and that person's lips were touching hers. When that happened, A. could see that the grownup touching her was defendant.

During this time, defendant also put his mouth on A.'s private part. At some point, mother woke up to use the bathroom. Defendant stopped, put A.'s clothing back on her, and then put A. back in bed. When A. used the bathroom the next morning, her urine was orange colored.

A. thought defendant had come into her room when she was in the fourth grade, sometime around Christmas break. A. thought this happened four times, but she was not 100 percent sure how many times—it was more than three times, but maybe less than five times. During cross-examination, A. said she thought her sister G. never woke up when defendant came into her room, and A. never called for her mother or her brothers on those occasions. She thought every time defendant came into her room a key had to be used.

Typically when A. went to sleep, she would lock the door because her mom told her to do so. A. knew that defendant was not supposed to have a key to her room, and she never saw him with a key. At some point, mother discovered defendant was "doing stuff" in A.'s room, and mother flushed one key down the toilet and threw the other one in the dumpster. Mother kicked defendant out of the house, but he moved back in later. A. could not remember what time of year that happened, but it was in the morning after one of the times defendant came into her room and touched her. A.'s sister told mother that defendant was doing these things to A., and A. also told her teacher, and she asked a friend to tell the teacher, too.

4.

A.'s sister, G., was seven years old at the time of trial. She testified she used to live with A., their two brothers, her mother and defendant in an apartment. There were two bedrooms; she slept in a room with her sister, and they slept on bunk beds. She remembered defendant coming into her room one night, and she heard him use a key to unlock the door. Defendant was not allowed to go into her room, and mother had put a lock on the door to keep him out. She and A. would lock the door at night, and they would leave the lava lamp on; there was no nightlight. When defendant came into their room, he put something in the toybox, but she did not see what it was. He also turned off the lava lamp. He looked up at G. lying on the top bunk, but he did not say anything, and she did not know what he did after that. She pretended to be asleep, and she was facing the wall. She felt scared because he was not supposed to be in their room. She did not know how long he was in their room, but she did not hear anything. Her mother woke up to go to the bathroom, and then defendant left the room. G. never talked to A. about what happened, but G. told her mom that he woke her up and he was in their room. When she told her mom this, G.'s mom looked angry. Her mom and defendant had an argument, and they were yelling. G. did not think her mother made defendant leave the apartment.

Mother testified she and defendant had dated for three years until 2018; prior to this, mother was homeless and had addiction issues. In June 2015, they moved into an apartment with mother's four children. Mother discovered defendant had touched A. around Christmas 2017. She felt defendant get out of bed one night, and then she went to the bathroom; she did not see him in the living room and when she turned around she saw him walking out of her daughters' room. This was a surprise because it was 2:00 or 3:00 in the morning. She asked him what he was doing, and he said he was checking on the kids. Mother "tripped out," and they had an argument. Mother asked defendant what was going on, and defendant would not tell mother anything at first. So mother woke up A. and asked her what had happened. A. told mother defendant had touched A. above her private area. Mother started yelling and got a knife. Defendant said he touched A. on her

5.

area above her private area, but he did not say what he meant by that. They ended up having a huge argument, and mother asked defendant to move out.

On cross-examination, mother testified she woke the girls up when she discovered defendant had been in their room. At first they did not know what she was talking about, but then she went back later and asked them again because something did not feel right. A. then said that defendant touched her. When mother then confronted defendant, he admitted he had touched A. over her clothes. Mother testified defendant admitted the touching that night was inappropriate—he admitted to touching her in her private area, but mother was not sure if she told the officers that during an interview.

Defendant only remained out of the apartment for about one or two months. After the incident, mother obtained locks and installed them—she purchased the locks before she let defendant back into the house. She told the girls the lock was to keep everybody out, and she told them to lock the door at night. Mother kept the keys in her purse, and she told defendant he was not allowed to use the keys. She had an argument with him a few weeks later when she saw him with a key in his hands; she asked him what he was doing with the keys, and then she threw them away in a dumpster or something. A. never told mother about another incident.

Mother did not report the Christmastime incident to law enforcement because she was afraid she would lose the kids. She was contacted by the police when they were informed about A.'s allegations by a teacher or the principal. Mother told the police A. had said something, but mother acknowledged that at first she told the police she did not know anything about A.'s allegation because she was scared and felt the need to protect defendant. She also told an officer that she had been a victim of sexual assault and molestation, so she was paranoid and overprotective of her children. She could not remember if she told one of the officers she had installed the locks before Christmas.

Another set of officers interviewed her. She indicated to them she is a light sleeper. She also made a statement that she saw defendant with a key that night, but then

6.

in another statement she told law enforcement that she had put the locks on the door in response to this event—there were no locks on the bedroom door at the time of the Christmastime incident. She clarified on redirect examination that she had seen defendant with keys to the bedroom on a later, separate occasion after he moved back into the apartment.

Officer Kayla Clark testified she was on duty on May 4, 2018, when she was dispatched to an elementary school regarding a report of a sexual assault. She first contacted the principal as officers are trained not to contact the student or the victim themselves to prevent traumatizing them further. She took statements from the principal, the teacher, and A.'s mother.

Detective John Rosel testified he was contacted by Officer Clark on May 4, 2018, about the allegations of an elementary school student. Rosel did not respond to the school, but he did take over the investigation. A CFIT (child forensic interview team) interview of A. took place on May 10, 2018, at 10:00 a.m., and Rosel was present. He also coordinated a pretextual phone call between mother and defendant. During the call, mother asked defendant to tell her that he would "never touch [A.] again." Mother pressed him to say that he would "never do it again," and defendant responded, "I won't do it again, ever."

Rosel also talked to G. on June 20, 2018, but G. did not remember they talked when she testified at trial. G. described to Rosel the incident where defendant came into her room; she told him that while she was on the top bunk she could hear noises coming from the bottom bunk.

Linda Khamsone is a forensic nurse who testified about a forensic SART (sexual assault response team) exam she conducted on A. on May 11, 2018. She did not collect any DNA during the exam because the information they had was that the assault occurred about a year and one-half prior to the exam. During the examination, Khamsone observed A.'s vaginal area and took photographs. All the examination findings of A.'s

vaginal area were normal, which is a frequent occurrence in sexual assault cases. Many times when a victim does not fight back, the examination findings are within normal limits. There was no visible scarring or tearing to A.'s vaginal area. While Khamsone indicated it is common for the hymen to break in prepubescent sexual intercourse, she could not say whether there had ever been a tear to A.'s hymen because it is possible for any tear to heal. Given the examination findings, Khamsone could neither confirm nor negate a sexual assault.

Angelica Limon, a child forensic interviewer, testified about the interview of A. she conducted. The interview was recorded, and it was played for the jury. She was cross-examined thoroughly about whether the interview questions she posed were leading or suggestive.

## II.    Defense Case

Officer Clark was also called as a defense witness. During her interview with mother, another officer posed the interview questions and Clark observed. When mother was first told about the allegations, mother appeared confused. Mother indicated she had installed locks on the children's room, and then said she was aware of what had happened because A. had told her the night it happened. Mother said the event occurred when the children were on winter break from school during December 2017. Mother said she woke up one night, realized defendant was not in bed, and she became concerned. When she looked for him, she found him coming out of A.'s bedroom. Mother referenced a key and said she was the only one who had access to the girls' room; she was clear that at this point the girls' room had a lock. Mother said she knew what happened when she saw defendant walking out of their room. Mother said she had her own history of sexual assault so she was overprotective of the kids. Mother said she made defendant leave the home, but she did not notify any authorities.

Clark indicated at the beginning of the interview mother said she had locks on the bedroom door—this was at the point in the interview when mother said she did not know

anything about the sexual misconduct. Mother said she did not understand how defendant could have gotten access because he did not have a key. Mother later said defendant told her that he was only checking on the girls.

Detective Brian Majors testified that he and Detective Garibay interviewed mother together on May 4, 2018. Mother thought the sexual assault occurred in mid-December 2016. As she is a light sleeper, mother said she awoke when her boyfriend was not in bed with her; she went to find out where he was, and she saw him coming out of her daughters' bedroom. Upon questioning defendant, he told mother he was just checking on the girls. Mother said she spoke to both girls, and A. told her that defendant had touched her on the top of her "'pooch.'" A. told mother that defendant had not put his hand under her clothing. Mother told the detectives she had beaten defendant and told him he could not stay in the home any longer. Mother never said anything about a knife during her argument with defendant, but she made reference to putting locks on the door to her daughters' room before defendant moved back into the apartment. Mother said this was the only incident of which she was aware.

Defendant testified in his own defense. He indicated he met mother about five years before and they moved into her parents' house, where they stayed for a year. Then they decided to get their own place with mother's four children. Defendant denied ever touching A. in a sexual or inappropriate way. He admitted he had gone into the girls' bedroom in 2016 because he heard a noise in their room when he was up to use the bathroom, so he went to check on them. At the time, he was afraid A.'s biological father had gotten into the house. The biological father had been coming to the house and starting arguments—he would often park his car in front of the apartment door and start yelling in front of the kids in a threatening way. In fact, this occurred about a week before defendant went into A.'s room, but he did not tell law enforcement about it during his police interview.

So, when defendant heard a crash coming from the girls' room, he went in just to see if everything was okay. He touched A. on her waist to see if she was awake. He wanted to know if she was the one who made the noise or whether it was coming from outside. G. was not awake. Then, he walked out of the room while mother was coming out of their bedroom and started questioning him about what he was doing. She told him he was not supposed to go into that room, and then she went into A.'s room to ask her if anyone had gone in there and whether anyone had touched her.

Defendant testified there were no locks on the door at this time. He thought mother was paranoid about the girls; she would never allow him near the girls or allow him in the girls' room. She also would not let the boys be alone with the girls in a room.

Defendant explained that during the pretext phone call with mother, he was just apologizing to mother for going into the girls' room when he was not supposed to, and for touching A. on her waist. He denied that he ever touched A. in a sexual manner.

On cross-examination, defendant acknowledged that he had never identified the kids' biological father by name to the police—he only mentioned he thought the kids' dad was in the house that night.[3] He never told the interviewing detective the biological father had threatened them in the past. He testified that after the argument with mother, defendant moved out, but they reconciled about a month later. Mother would not believe that he had not done anything, so he thought it would be best if he moved out. When he moved back in, the locks were installed, and she never gave him a key.

## DISCUSSION

### I.   No Ineffective Assistance of Counsel

Defendant claims his trial counsel was ineffective for failing to object to a portion of the CFIT interview during which A. related information she overheard. A. stated she overheard her mother's friend tell mother that defendant had touched the friend the same

---

[3]   Defendant testified this person was the biological father of all the kids except G.

way he had touched A. Defendant asserts his counsel's conduct violated his federal and state constitutional rights to effective assistance of counsel.

## A. Background

During the CFIT interview, the following exchange occurred between A. and the social worker:

"Q: Mm-kay, and have you ever seen [defendant] do this to anybody else?

"A: No.

"Q: Okay.

"A: But one day a lady came over 'cause [defendant] left, um, the b—the day before Christmas. And then a lady came over that was my mom's best friend and she…

"Q: What's her name?

"A: I don't know her name. And she came over and then, um, she told my mom that [defendant] was like drunk and went in the car and he did the same thing that he did to me to her.

"A: To the lady?

"A: Yeah but she was homeless the lady.

"Q: What did—what's the same thing?

"A: Like he touched me in my—he touched her private and then he put his private in her private. That's what she said to my mom.

"Q: Okay and how do you know this?

"A: Because one day she came over and told my mom…

"Q: Were you—oh, were you there?

"A: Yeah.

"Q: Did you hear everything?

"A: Yes.

"Q: Oh, okay I see, okay. What was—and you said you didn't know the lady's name.

"A: No.

"Q: And you said she's homeless.

"A: Yeah and she was my mom's best friend. I meant, um, my mom let her sleep in her car.

"Q: And your mom let her best friend sleep in the car.

"A: Yeah.

"Q: How come she didn't let her sleep inside the car?

"A: Yes she did that.

"Q: I mean inside the house?

"A: Oh, because.

"Q: Okay, all right. Is there anything else, um, that we need to talk about? Anything else that [defendant] did to you or to anybody else or anything?

"A: No."

**B.      Analysis**

A criminal defendant's federal and state constitutional rights include the right to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) To establish ineffective assistance of counsel, the appellant must show (1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the appellant to prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the result would have been more favorable to the appellant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 217–218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra*, at p. 694.)

In evaluating defendant's claim, we "'defer[] to counsel's reasonable tactical decisions' and presume that 'counsel acted within the wide range of reasonable professional assistance.' [Citation.] Thus, defendant '" must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'""" (*People v. Arrendondo* (2019) 8 Cal.5th 694, 711.) This burden is especially difficult here because the record does not disclose the reason for defense counsel's failure to object to this portion of the CFIT interview. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

"When … defense counsel's reasons for conducting the defense case in a particular way are not readily apparent from the record, we will not assume inadequacy of representation unless there could have been '"no conceivable tactical purpose"' for counsel's actions." (*People v. Earp* (1999) 20 Cal.4th 826, 896.) "'[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.'" (*People v. Salcido* (2008) 44 Cal.4th 93, 172.) Rather, "'except in those rare instances where there is no conceivable tactical purpose for counsel's actions,' claims of ineffective assistance must be raised in a petition for writ of habeas corpus based on matters outside the record on appeal." (*Ibid.*, quoting *People v. Lopez* (2008) 42 Cal.4th 960, 972.)

The People maintain that, as a matter of trial strategy, defense counsel may have elected not to object to this portion of the CFIT interview to provide a basis to argue A. learned about the sexual conduct she described from overhearing her mother talk to a homeless friend. Indeed, defense counsel made this precise closing argument. Defense

counsel argued that the CFIT interview raised a question about "how would a little girl know about" what A. described. Defense counsel then articulated the following theory: "little girls who have moms with very active imaginations can fill in a lot of gaps because remember she talked about hearing her mom speak to one of her homeless friends? So she's listening to conversations among adults, there's a lot of ways of picking stuff up."

We agree defense counsel may have elected not to object to this portion of the CFIT for this strategic reason. Indeed, the prosecutor argued to the jury that A.'s interview statements about what happened were trustworthy because a young girl of nine would not be able to relate sexual details of that nature unless she had personal experience. Defense counsel may very well have anticipated that this portion of the CFIT interview gave the defense a legitimate way to counter a credibility argument the prosecutor might, and actually did, present.

In conjunction, defense counsel could have concluded the jury was unlikely to credit what A. thought she overheard: that *defendant* sexually assaulted or had a sexual encounter with mother's friend. It is somewhat implausible that a friend would relate a sexual encounter of any type to the girlfriend of the assailant—so there was reason to wonder if A. had mixed up some of the details she overheard. Additionally, A.'s statements about her mother's friend constituted a very small portion of the CFIT interview and no extensive details about what A. overheard were elicited. On balance, defense counsel could have reasonably concluded this portion of the CFIT interview was more useful to the defense than damaging. Thus, there was a conceivable tactical basis for defense counsel not to interpose an objection to this portion of the CFIT interview.

On this record, since there could have been a tactical basis for defense counsel not to object to A.'s statement about mother's friend, counsel's failure to do so cannot be deemed ineffective assistance of counsel. (*People v. Weaver* (2001) 26 Cal.4th 876, 926 [where counsel's trial tactics or strategic reasons for the challenged decision do not

14.

appear on the record, no ineffective assistance of counsel lies unless there could be no conceivable reason for counsel's act or omission].)

But even if defense counsel's failure to object could be deemed professionally deficient, there is no reasonable probability the outcome of the trial would have been more favorable to defendant absent this portion of the CFIT interview. As noted, A.'s statements constituted a very brief, undetailed reference to an event she only overheard adults talking about. There was reason for the jury to believe A. did not overhear correctly or accurately. Because of the limited nature of A.'s statements about what she overheard, this isolated portion of the CFIT interview was not particularly likely to evoke an irrational emotional response from the jury or motivate the jury to conclude it was indicative of defendant's guilt. Thus, even though the jury apparently rewatched the CFIT interview during deliberations, it was unlikely to have had any effect on the outcome.[4]

Beyond that, the prosecutor did not ask any questions during trial about this purported incident, and, contrary to defendant's assertion, the prosecutor did not discuss it or even mention this portion of the CFIT interview in closing argument. Defendant's opening brief cites a portion of the prosecutor's closing argument wherein he urged the jury to credit A.'s testimony and her CFIT interview statements because "[A.] had already disclosed that something had happened, to her mother and to her friend." In context, the prosecutor was referring to the fact that A. had reported to mother that defendant had touched A. inappropriately, and A. told this to a friend at school. Defendant's reply brief again asserts the prosecutor told the jury to consider what defendant had done to her mother's friend, but no citation to the record is provided and we find no such reference in either the prosecutor's closing or rebuttal arguments.

---

[4] The jury sent a note to the court asking to rewatch the CFIT interview.

The prosecutor did invite the jury to rewatch the CFIT interview to assess A.'s demeanor and to consider that her statements were not coached or the product of leading questions by the interviewer. However, the prosecutor never highlighted for any purpose A.'s statement about her mother's friend.

Finally, the evidence of guilt was strong. A.'s trial testimony about how defendant touched her was fairly consistent with her CFIT interview; both mother and G. corroborated that defendant was in the bedroom with A. during the Christmastime incident, and mother testified he admitted to being in the bedroom and touching A.— although defendant claimed he never touched A. sexually or inappropriately. There was also a pretext phone call between mother and defendant in which he apologized and promised never to touch A. again.

In sum, the CFIT interview statement about mother's friend was neither detailed nor emphasized by the prosecution in any way. If anything, the statement allowed the defense to present an alternative to the prosecutor's argument that at the time of the CFIT interview A. could only have known about this type of sexual conduct from her own experience. Considering the whole record, the admission of this statement is not sufficient to undermine confidence in the outcome. (*Strickland, supra*, 466 U.S. at p. 694.) Even if we assume there was deficient performance by defense counsel, no resulting prejudice has been established.

## II.     Assembly Bill No. 1869

At the sentencing hearing, the trial court orally imposed a $108.19 booking fee pursuant to former Government Code section 29550.2, payable to the City of Madera. This fee is reflected on the abstract of judgment. Defendant contends this booking fee was eliminated under Assembly Bill No. 1869, which was signed into law after sentencing in this case took place. The People agree that the jail booking fee is unenforceable pursuant to Government Code section 6111, subdivision (a), after July 1, 2021, but argue there is no need to strike the jail booking fee—the People maintain any

16.

unpaid fee simply becomes uncollectible starting July 1, 2021, without the involvement of the courts.[5]

In 2020, the Legislature passed Assembly Bill No. 1869 to "eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system .…" (Assem. Bill No. 1869, ch. 92, § 2, p. 3.) Among other things, Assembly Bill No. 1869 added Government Code section 6111. (Assem. Bill No. 1869, *supra*, at § 11, p. 14.) Government Code section 6111 became effective on July 1, 2021, and provides that "the unpaid balance of any court-imposed costs pursuant to … [Government Code section] 29550.2 … as [that] section[] read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing th[at] cost[] shall be vacated." (Gov. Code, § 6111, subd. (a).)

The language of Government Code section 6111 was recently considered in *People v. Greeley* (2021) 70 Cal.App.5th 609, 625–627. The court reasoned there was no need to apply a presumption of retroactivity in construing the statute because, by its plain terms, the ameliorative changes of Assembly Bill No. 1869 apply retroactively to make any unpaid portion of the identified assessments, as they existed on June 30, 2021, unenforceable and uncollectible as of July 1, 2021. (*People v. Greeley, supra*, at p. 626.) The court also explained that Government Code section 6111 unambiguously mandates vacatur of a portion of a judgment for the purposes of striking the newly unauthorized assessments. Specifically, Government Code section 6111 states the "unpaid balance of any court-imposed costs pursuant to … [Government Code] section 29950.2 … as [that] section[] read on June 30, 2021, is unenforceable and uncollectible *and* any portion of a judgment imposing those costs *shall be vacated.*" (Gov. Code, § 6111, subd. (a), italics added.) Given the "shall be vacated" language as well as the Legislature's usage of the conjunction "and," the court concluded that "although the unpaid balance of the

---

[5]    The parties' supplemental briefing was completed before July 1, 2021.

17.

identified fees is no longer enforceable and collectible, the statute *also* mandates that any portion of a judgment imposing those fees be vacated." (*People v. Greeley, supra*, at p. 626, fn. omitted.)

In *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, the court similarly concluded that Government Code section 6111, subdivision (a), not only entitles a defendant to vacatur of unpaid criminal justice administration fees as of July 1, 2021, but also to the modification of the judgment consistent with such vacatur. (*People v. Lopez-Vinck, supra*, at p. 953.) The court additionally reasoned that while the reference to "'those costs'" to be vacated in Government Code section 6111, subdivision (a), is ambiguous, "in that 'those costs' could refer to the entirety of the fee imposed by the trial court, such that the vacating of 'those costs' would eliminate the fee in its entirety, … the statutory scheme supports interpreting the phrase 'those costs' as referring only to that portion of [the] fee imposed by the court that *remains unpaid* as of July 1, 2021." (*People v. Lopez-Vinck, supra*, at pp. 953–954.)

We agree with these courts' analyses that the plain language of Government Code section 6111 mandates vacatur of fees that are no longer enforceable and collectible as of July 1, 2021. Moreover, "those costs" to be vacated include only the *unpaid* balance as of July 1, 2021. (Gov. Code, § 6111.) We exercise our authority to modify the judgment as mandated under Government Code section 6111, subdivision (a), and we vacate any balance of the $108.19 jail booking fee that remains unpaid as of July 1, 2021 (Pen. Code, § 1260).

## DISPOSITION

As modified, the judgment is affirmed. The trial court shall correct its records to reflect that any balance of the jail booking fee imposed pursuant to former Government Code section 29550.2 that remains unpaid as of July 1, 2021, is vacated, and the court shall forward any corrections to the appropriate authorities.

MEEHAN, J.

WE CONCUR:

LEVY, Acting P. J.

DeSANTOS, J.

19.